**DeKALB COUNTY, GEORGIA, Appellant,**

v.

**HENRY C. BECK COMPANY, Appellee.**

**No. 23256.**

United States Court of Appeals
Fifth Circuit.

Sept. 15, 1967.

George P. Dillard, Decatur, Ga., Herbert O. Edwards, Robert E. Mozley, Asst. DeKalb County Attys., for appellant.

George B. Haley, Jr., Wilbur Branch King, Atlanta, Ga., for appellee; Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., of counsel.

Before BROWN, Chief Judge, TUTTLE and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This case concerns the power of De-Kalb County, Georgia, to assess and collect what is termed a building permit fee from a contractor engaged in construction of a building for the United States on land located within DeKalb County and owned by the United States.

Appellee, the contractor, entered into a contract with the Veterans Administration for construction of a government hospital in DeKalb County at a cost of thirteen million dollars. The construction site was on land acquired by the United States in 1962 by warranty deed from Emory University. The contract placed on appellee responsibility for obtaining necessary permits and licenses and for complying with applicable federal, state and municipal laws, codes and regulations.[1]

The county sought to collect from appellee a permit fee under § 4–21 of the DeKalb County Code.[2] Appellee declined to pay, the county sued in state court, appellee removed. The case was submitted on motion of appellee for summary judg-ment and stipulated facts. It was stipulated that if the county is entitled to recover it is under § 4–21. The motion was granted without reasons assigned. The county appeals.

The first inquiry is whether the United States has assumed such jurisdiction over the land of the construction site as to exclude the power of the state (and the county as its delegate) to assess and collect the permit fee.

▮▮ Congress has power to exercise jurisdiction over federal enclaves under Art. I, § 8, cl. 17, of the Constitution.[3] The federal government may, without the consent of the state, acquire land within a state by condemnation or purchase. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). But without state consent the United States does not obtain the benefits of Art. I, § 8, cl. 17, and its possession is that of an ordinary proprietor. By § 15–301 of the Code of Georgia of 1933 the State of Georgia has given consent to federal acquisition of sites for "needful buildings."[4] Sec. 15–302, as amended,[5]

1. The provision read:
  "12. PERMITS AND RESPONSI-BILITIES
  "The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the prosecution of the work. * * *."

2. "No new construction or alterations or repairs shall be begun, the cost of which exceeds three hundred dollars, without first obtaining a permit from the building inspector and the building inspection department of the county, and there is hereby provided a fee for such permit which shall be one dollar and fifty cents per thousand for the first one million dollars cost of construction and one dollar per thousand for all over one million dollars, based upon contract price or cost per square foot as estimated by the inspection department; the minimum fee shall be one dollar and fifty cents. Such fees shall be paid to the building inspector and the building inspection department before any permit shall be issued. Such fee shall be remitted to the treasury."

3. "To exercise exclusive Legislation in all Cases whatsoever * * * over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of * * * needful Buildings * * *."

4. § 15–301: "Cession to the United States of land for public buildings, forts, etc.— The consent of the State is hereby given, in accordance with the 17th clause, section 8, of Article I, of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any lands in this State which have been or may hereafter be acquired for sites for customs houses, courthouses, post offices, or for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

5. § 15–302: "Jurisdiction.—Exclusive jurisdiction in and over any lands so acquired by the United States is hereby ceded to the United States for all purposes except service upon such lands of all civil and criminal process of the courts of this State; but the jurisdiction so ceded shall continue no longer than said United States shall own such lands. The State retains its civil and criminal jurisdiction over

expressly cedes jurisdiction to the United States over lands so acquired except that the State retains civil and criminal jurisdiction under certain circumstances and jurisdiction over regulation of public utilities. Sec. 15–303 provides, "The jurisdiction hereby ceded shall not vest until the United States shall have acquired the title to the said lands by purchase, condemnation or otherwise * * *."

In 1940 Congress enacted what is now the eighth paragraph of 40 U.S.C.A. § 255.[6]

In this case the United States has taken no affirmative action to accept jurisdiction over the land. It has done no more than take title by deed. The appellee seeks to convince us that the language of § 255, "by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated," read together with Secs. 15–301 through 15–303 of the Georgia Code, operated to vest in the United States exclusive jurisdiction forthwith upon its acquisition of title.

■■ Whether the United States has acquired exclusive jurisdiction over a federal enclave is a federal question. Paul v. United States, supra. Adams v.

United States, 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943), held that absent the giving of notice now required by § 255 the federal government cannot have either partial or exclusive jurisdiction over land acquired subsequent to the enactment of the notice provision. That case discusses the policies and the history behind the addition of the notice requirement to § 255. The language "or in such other manner as may be prescribed by the laws of the State" does not relate to the decision of the United States whether it shall or shall not acquire jurisdiction, but to the mode by which acceptance is indicated once the appropriate officer has deemed it desirable to acquire jurisdiction.

■■ A state may condition its consent to federal acquisition upon state retention of jurisdiction over the land consistent with the federal use. Paul v. United States, supra. But this case does not involve that principle, nor is this case a matter of the State's undertaking to condition its consent to federal acquisition upon acceptance by the United States of all jurisdiction that the State does not expressly retain. Sec. 15–302 is a partial cession of jurisdiction. Sec. 15–303 describes time of vesting. Neither purports to condition State consent upon federal acceptance.

persons and citizens in said ceded territory, as over other persons and citizens in this State, except as to any ceded territory owned by the United States and used by the Department of Defense and except as to any ceded territory owned by the United States and used by the Department of Justice for penal institutions, custodial institutions, or correctional institutions, but the State retains jurisdiction over the regulation of public utility services in any ceded territory. Nothing herein shall interfere with the jurisdiction of the United States over any matter or subjects set out in the Acts of Congress donating money for the erection of public buildings for the transaction of its business in this State, or with any laws, rules, or regulations that Congress may adopt for the preservation and protection of its property and rights in said ceded territory, and the proper maintenance of good order therein."

6. "Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Un-

■ We hold that the United States had not accepted jurisdiction.[7] Having reached this conclusion it is unnecessary for us to discuss the contentions that Secs. 15–301, 15–302 and 15–303 are void as in violation of the Georgia Constitution.[8]

■ We now turn to consideration of the supremacy clause in a situation where there has been no acceptance of federal jurisdiction. Application of the supremacy clause of the Constitution, Art. VI, cl. 2, requires determination of, and balancing of, state and local action against federal policy. In Leslie Miller, Inc. v. State of Arkansas, 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956), it was held that the State could not require a contractor on federal work to obtain a license from the contractors' licensing board because the requirements of the board relating to competency, character, financial responsibility, prior defaults, willingness to preserve public health and safety, and like factors, conflicted with federal requirements established to secure the reliability of the contractor and frustrated the expressed federal policy of selecting the lowest "responsible" (as defined by federal policy) bidder.

In Public Housing Administration v. Bristol Township, Buchs County, Pa., 146 F.Supp. 859 (E.D.Pa., 1957), the district judge was guided by indicia in the Lanham Act, 42 U.S.C.A. §§ 1521–1590, to conclude there was congressional intent that the private contractor on the project conform with local building code requirements (concerning building permits for electrical repair work) designed to protect the public safety. James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596 (1940), is an-

other public safety case. It held the contractor on a federal post office job must comply with safety requirements of the State of New York that open steel tiers be boarded over to protect workers.[9]

The difficulty with attempting to weigh this particular DeKalb County action against the applicable federal policy is that on this summary judgment record there is not a sufficiently complete picture at either end of the scales. The parties have called on the widest scope of judicial notice, and allegations of fact not in the record, to flesh out the skeleton.

The county says the permit fee is a nondiscriminatory tax, valid under Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937), the contractor that the charge is part of a general and all-embracing regulatory scheme which illegally invades the field of the federal government's right to build its own buildings according to its own standards. But there is too much we do not know. Sec. 4–21 is in Art. IV of the county code, headed "Standards of Construction," interspersed between sections dealing with such items as chimneys, roof decking, and bathroom ventilation. Its immediate successor, § 4–22, provides:

> "*Certificate of occupancy to be issued prior to occupancy.*
>
> "No residential, commercial or industrial building shall be occupied in the county until all construction is complete and final inspections have been made by the department of inspections and final approval given."

This arrangement suggests that the permit is part of a general plan for controlling construction standards. Yet

---

less and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

7. Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964) does not require a different result. Though decided in 1964, it concerned land acquired by the United States ten years before adoption of § 255.

8. See International Business Machines Corporation v. Evans, 213 Ga. 333, 99 S.E. 2d 220 (1957).

9. In general, as to applicability of state statutes and municipal regulations to contracts for performance of work on federal land, see annotations 91 A.L.R. 779, 115 A.L.R. 371, 127 A.L.R. 827.

the county argues that it neither has done nor proposes to do anything except collect the fee, which is a revenue measure, and that collecting it before work begins is just a convenient time to collect it. The extent, if at all, to which the county either uses, or attempts to use, the permit requirement as a means to control building standards, to require changes or variations in government specifications, the number and scope of inspections as work progresses, and like means for assertion of authority over federal construction, we do not know. It is not made known to what degree, if at all, the permit requirement is a public safety measure. The building was not completed when the motion for summary judgment was filed, so it is not known whether § 4–22 was sought to be applied.

Sec. 4–21 contains no provision for furnishing plans to the building inspection department before a permit may be obtained. But § 4–20 adopts by reference the "standards of construction" of the National Building Code; Article I of that Code, titled "Administration", requires that plans be submitted ahead of time and that they will be approved and a permit issued only if supervisory officials find the proposed work to be in compliance with the law and applicable ordinances. What DeKalb policy is on these matters we are not informed.

The "standards of construction" of the National Building Code, adopted by reference, are in the record, but it is not possible to determine whether those standards are the same as, or different from, the specifications on the hospital job, for the latter are not in the record.

On the other end of the scales the court was not presented any information of federal policy as to building standards for veterans' hospitals in general and this one in particular, of whether there is any federal policy of compliance of veterans' hospital construction with local standards as in Lanham Act housing, nor of what, if anything, the county has done in this case except try to collect money for the treasury.

[10] The county contends the fee is sustainable as a valid charge for use by the contractor of streets for heavy equipment, for fire protection, police escorts, traffic rerouting, clearing of debris, and like services. But the record is silent as to which of these are furnished by De-Kalb County to contractors in general and this appellee in particular. Judicial notice is not an appropriate basis on which to test out this theory.

In summary, there was not made available to the court the sort of information as to local action and policy, and federal policy, that was available in *Miller* and in the *Bristol Township* case and that could serve as a basis for decision on a delicate federal-state matter.

This is the sort of case which this court referred to in Brotherhood of Railroad Trainmen v. Central of Georgia Railway Company, 305 F.2d 605, 609 (5th Cir. 1962):

"This case, however reveals again— what can so easily be seen from the vantage of an appellate Court, though understandably obscured by the overpowering pressures of congested dockets in the trial Court—that in these matters of such public importance, it is often an unsure thing to elucidate decisions of like import in the unavoidably academic atmosphere of mere pleadings or even a stipulated agreed statement in terms of what the lawyers conceive the problem to be, rather than what the nuances of the facts make it out to be, Public Affairs Associates, Inc. v. Rickover, 1962, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604; Kennedy v. Silas Mason Co., 1948, 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347; and see Braniff v. Jackson Ave. —Gretna Ferry, Inc., 5 Cir., 1960, 280 F.2d 523, 526, reh. den. 289 F.2d 939; Chapman v. Hawthorne Flying Service, 5 Cir., 1961, 287 F.2d 539, 541. Cf. United States v. Diebold, 1962, [369 U.S. 654,] 82 S.Ct. 993, 8 L.Ed.2d 176."

We conclude that summary judgment should not have been granted. We deem

it unnecessary to comment on other issues which can be disposed of more appropriately in the district court.

Reversed and remanded.